**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Case No. 23-cr-226 (DSD/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Damien Duwjan Shade, | |
| Defendant. | |

## INTRODUCTION

Defendant Damien Duwjan Shade is charged with one count of attempt to possess with intent to distribute methamphetamine and one count of being a felon in possession of a firearm. He moves to suppress the drug evidence, arguing that law enforcement seized the packages containing methamphetamine in violation of the Fourth Amendment. For the reasons explained below, the Court recommends that Shade's Motion to Suppress Evidence Obtained as a Result of Unlawful Seizure [Dkt. No. 25] be denied.

## FINDINGS OF FACT

On March 23, 2023, FedEx identified three suspicious packages in transit from San Diego, California, to Winona, Minnesota. Gov't Exs. 2, 3. "Based on research and trends, FedEx believe[d] that the shipment contain[ed] meth," and it flagged the packages for security screening. Gov't Ex. 3. Employees in the Indianapolis hub were supposed to "pull" the packages from the line but did not do so in time. Tr. of Mot. Hrg. at 6:13-6:18; Dkt. No. 36. The next stop on the route was the FedEx facility in Rochester, Minnesota. *Id.* An unidentified FedEx employee at the Indianapolis hub sent an email to two employees at the Rochester facility: senior manager of operations Julie Reeves-Martin,

and the facility's security specialist. *Id.* at 6:11-7:4. The email instructed Reeves-Martin to pull three packages, identified by their addresses and tracking numbers, for the security specialist to screen. *Id.* at 7:16-8:23. The security specialist responded that they were out of town and would not be able to screen the packages. *Id.*

The FedEx employee who had sent the email then instructed Reeves-Martin to contact local law enforcement to ask if they could screen the packages. *Id.* at 8:1-8:3. The employee also contacted an agent at Homeland Security Investigations (HSI) to request that law enforcement perform the screening. Gov't Ex. 2. Reeves-Martin directed one of her employees to remove the packages and bring them to the front office while she called the Rochester Police Department.[1] Tr. of Mot. Hrg. at 8:7-9:16; Dkt. No. 36.

HSI Special Agent Zoee Brubaker, who had been assigned to the case, coordinated with the Rochester Police Department to have a K-9 trained to detect controlled substances brought to the Rochester FedEx facility. Gov't Ex. 4. Agent Brubaker, the Rochester Police Officers, and the K-9 all arrived at the facility. *Id.* The K-9 indicated that the packages likely contained drugs. *Id.* The officers left with the unopened packages. *Id.*

The packages remained unopened in the custody of the Rochester Police Department while officers applied for a search warrant. *Id.* The Olmsted County District Court granted the warrant, *id.*, and officers opened the packages, finding approximately six pounds of methamphetamine hidden inside stuffed animals.[2] Officers drafted

---

[1] It is unclear from Reeves-Martin's testimony whether the packages were removed before, during, or after she called the Rochester Police Department.
[2] The remaining factual background is drawn from the Government's briefing, Dkt. No. 27, as Defendant's motion provides no facts and neither Reeves-Martin's testimony nor the Government's exhibits address what happened after the warrant was granted.

anticipatory search warrants for the two intended delivery addresses and conducted controlled deliveries.[3] After delivering a package to one of the addresses, officers witnessed Defendant Shade open the door to retrieve it and bring it inside. Officers followed Shade to the second delivery address, where the other two packages had already been delivered. Officers detained Shade when he arrived at the second address. Executing the anticipatory search warrants, officers found the two packages inside the apartment already opened. Officers returned to the first address, where they found the other package, approximately 30 small plastic bags in an unlocked safe, and "what appeared to be a drug ledger." Dkt. No. 27 at 3. Officers also found a loaded .357 Magnum revolver, hundreds of rounds of ammunition, and one spent shell casing. Shade was arrested and indicted on charges of attempt to possess with intent to distribute methamphetamine and being a felon in possession of a firearm. Dkt. No. 1.

## CONCLUSIONS OF LAW

Shade seeks to suppress the evidence seized from the three packages. He argues that the methamphetamine was "obtained from the search of packages which were illegally seized from the commercial carrier by law enforcement without a warrant, without reasonable suspicion, without probable cause, and without any constitutional justifications." Dkt. No. 25 at 1. The Government counters that FedEx had already identified the packages as potentially containing drugs and diverted them for investigation before it contacted HSI. Thus, it was not acting as a government agent when it detained

---

[3] The packages were addressed to two individuals at separate addresses in Winona, Minnesota. *See* Gov't Exs. 2-3; Dkt. No. 27 at 2 n.2.

3

the packages. Moreover, the Government argues, law enforcement had reasonable suspicion to seize the packages from FedEx based on a positive K-9 identification.

Shade does not appear to challenge FedEx's actions in seizing and detaining the packages, but rather law enforcement's actions upon arrival at the FedEx facility. Nonetheless, because the evidence shows that FedEx communicated with law enforcement about the detained packages before officers arrived at the scene, the Court addresses both the private and government seizures.

## I. Private Seizure

The Fourth Amendment's guarantee against unreasonable searches and seizures extends to packages sent by mail. *See United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999). However, while law enforcement authorities are required to have reasonable suspicion that a package contains contraband before they may detain the package, *id.*, common carriers are not. *See Illinois v. Andreas*, 463 U.S. 765, 769 n.1 (1983). Thus, the Fourth Amendment's "protection against unreasonable searches and seizures 'is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *United States v. Mithun*, 933 F.2d 631, 634 (8th Cir. 1991) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)).

Courts consider several factors in determining whether a private individual or entity is acting as an agent of the government. "Chief among these are whether the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes; and whether the citizen acted at the government's request." *United States v. Smith*, 383 F.3d

700, 705 (8th Cir. 2004). However, when the private entity acts of its own accord in seizing a package, the fact that the government knew of and acquiesced in the seizure does not render the private entity an agent of the government. *See id.*

The evidence here shows that FedEx independently identified the packages as suspicious and decided to remove them for security screening. In an email dated March 23, 2023, an unnamed FedEx employee informed HSI Special Agent David Coggins that "the three domestic shipments are currently being held" at the Rochester facility, but because "[t]he security specialist for FedEx is away on business travel and is unable to screen these shipments," the employee requested that law enforcement perform the screening. Gov't Ex. 2. This email establishes that FedEx contacted HSI only to request screening of packages that had already been diverted. Thus, the Government did not have knowledge of or acquiesce in the initial seizure and FedEx could not have "acted at the government's request." *Smith*, 383 F.3d at 705. Additionally, FedEx normally would have had its own security specialist perform the screening, suggesting that it did not "intend to assist law enforcement agents" when it requested law enforcement screening. *Id.* Rather, it was carrying out its "duty to refrain from carrying contraband." *Id.* (quoting *Illinois,* 463 U.S. at 769 n. 1 (1983)). FedEx was not acting as an agent of the government when it detained the packages at the Rochester facility.

Shade also argues that his "reasonable expectations for how the package might be handled when in the carrier's custody was breached, rendering the action a seizure." Dkt. No. 25 at 2. The basis for this claim is unclear, but even construing all the facts in Shade's favor, the argument must fail. The Eighth Circuit has stated that "the sender's reasonable expectations of how the carrier would handle the package define the scope

5

of the carrier's custody." *United States v. Zacher*, 465 F.3d 336, 339 (8th Cir. 2006). In other words, law enforcement might enact a seizure by moving, delaying, or otherwise handling a package in a way FedEx would not. *See United States v. Green*, 9 F.4th 682, 689 (8th Cir. 2021). But there is no such evidence presented here. Rather, the packages were identified, pulled, and moved to the front office by FedEx employees; the officers did not handle the packages at all until after the K-9 made a positive indication.

## II.     Government Seizure

Shade argues that law enforcement seized the packages without a warrant, reasonable suspicion, or probable cause. However, officers need only "reasonable suspicion that a piece of mail, or a package shipped via a commercial carrier, contains contraband to lawfully seize it for investigative purposes." *Smith*, 383 F.3d at 704. Because Shade challenges only the seizure of the unopened packages, and the officers' search and subsequent arrest were supported by a probable cause warrant, the Court addresses only whether the officers had reasonable suspicion to seize the packages.

The facts show that the officers seized the packages only after a K-9 trained to detect controlled substances indicated that they contained drugs. "[A] K9's positive indication allows an officer to seize a package to further investigate it. In other words, if a K9 alerts to a package, then an officer has reasonable suspicion to seize that package." *Green*, 9 F.4th at 688 (internal citation omitted). The Eighth Circuit has repeatedly held that a K-9's positive indication provides reasonable suspicion for officers to detain a package. *See, e.g., id.*; *Zacher*, 465 F.3d at 339; *United States v. Vasquez*, 213 F.3d 425, 427 (8th Cir. 2000); *United States v. Sundby,* 186 F.3d 873, 876 (8th Cir. 1999). The officers here had reasonable suspicion to seize the packages.

In short, FedEx, a common carrier, was not acting as an agent of the government when it decided to detain packages it suspected contained methamphetamine. The government's later seizure of the packages was supported by reasonable suspicion. Because the evidence was not seized in violation of the Fourth Amendment, the Court recommends the motion to suppress be denied.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT Defendant's Motion to Suppress Evidence Obtained as a Result of Unlawful Seizure [Dkt. No. 25] be **DENIED**.

Dated: May 23, 2024
        s/David T. Schultz
        DAVID T. SCHULTZ
        U.S. Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).